**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 17 CR 342-1 |
| MATTHEW MINTZ, | ) | Chicago, Illinois |
| | ) | May 30, 2017 |
| Defendant. | ) | 12:45 P.M. |

TRANSCRIPT OF PROCEEDINGS - Detention Hearing
BEFORE THE HONORABLE JEFFREY COLE, Magistrate Judge

APPEARANCES:

For the Government:        HON. JOEL R. LEVIN
                           219 South Dearborn Street
                           Chicago, Illinois  60604
                           BY:  MR. AARON RICHARD BOND

For the Defendant:         MS. BLAIRE C. DALTON
                           53 West Jackson Boulevard
                           Suite 1420
                           Chicago, Illinois  60604

PAMELA S. WARREN, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 2342
Chicago, Illinois   60604
(312) 408-5100

**NOTE:  Please notify of correct speaker identification.
FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS
UNINTELLIGIBLE.**

```
 1            (Proceedings held in open court:)
 2            THE CLERK:  17 CR 342, United States versus Mintz.
 3            MS. DALTON:  Good afternoon, your Honor.  For the
 4   record Blaire Dalton on behalf of Mr. Mintz, who is present.
 5            MR. BOND:  Good afternoon, your Honor.  Aaron Bond on
 6   behalf of the United States.
 7            THE COURT:  Okay.  Mr. Bond.
 8            MR. BOND:  Yes, your Honor.  I believe we did the -- a
 9   proffer regarding the request of the government to detain this
10   defendant on Friday, which --
11            MS. DALTON:  Friday.
12            MR. BOND:  Friday.  If you -- would your Honor like to
13   hear more or --
14            THE COURT:  No.
15            MR. BOND:  Okay.  I would like to make one point of
16   clarification.
17            THE COURT:  Sure.
18            MR. BOND:  And I did speak with defense counsel about
19   this.  I did --
20            THE COURT:  And the question only is how he gets --
21   how he goes back, right?
22            MR. BOND:  Sure.
23            THE COURT:  Yeah.
24            MR. BOND:  You know, I just wanted to clarify though
25   when I read into the -- when I discussed through my proffer
```

1  that there had been (unintelligible) this defendant and his
2  girlfriend, who is also a defendant, the indication was that
3  they had stayed in different --
4          THE COURT:  Separate.
5          MR. BOND:  Yes.  And it was not -- it was not clear or
6  delineated whether it was -- the way I am reading it again, it
7  appears that they were staying in different locations.  Didn't
8  specify whether they were staying together.
9          THE COURT:  For the whole -- the whole time or --
10         MR. BOND:  They were staying in different apartments.
11         THE COURT:  Yeah.
12         MR. BOND:  And then they had a ten-day period where
13 they stayed with the co-defendant's father.  It appeared that
14 they were staying, even though it didn't say or read that they
15 were staying together.  My rereading indicated what counsel
16 indicated, they were most likely staying together, not
17 separate.  There was no mention of them being separate.
18         THE COURT:  Okay.
19         MR. BOND:  So I just want to clear it up.  I didn't
20 want to mislead the Court, so --
21         THE COURT:  All right.  No, that's fine.
22         MS. DALTON:  And, Judge, on Friday I had -- and
23 indicated that we had requested a continuance to have
24 Mr. Mintz's mother be present.  She is present in court.  She
25 has spoken with pretrial services to verify what he had

1  previously told pretrial services. And she is also more than
2  willing to act as a third-party custodian.
3          THE COURT: It says in the report that he was supposed
4  to have a follow-up appointment on May 24th.
5          MS. DALTON: Yes, for blood tests and an EKG, Judge.
6          THE COURT: And did he?
7          MS. DALTON: Well, no, because he was in custody.
8          THE COURT: Oh, I'm sorry. Time passes so quick.
9          Well, all right. The question really is should he be
10 in custody to go back to Minnesota or not. I don't think any
11 period of custodial supervision is particularly -- well, I
12 mean, it is hard. It is infinitely better than being here and
13 being in for the duration.
14         Having said that, the conditions I have to examine are
15 whether he's going to get to Minnesota or he's not. I
16 think -- I think the government has the better of the argument
17 in this particular case. And I think that for the reasons the
18 government has set forth, there is a risk he's not going to get
19 back to Minnesota. So I'm going to order him detained in the
20 custody of the marshals and to be taken immediately back to
21 Minnesota.
22         Should that not arise, Ms. Dalton, you're free to come
23 back and seek whatever you want to seek. My experience has
24 been that they are very efficient in getting people back. So
25 if I am wrong, I'm wrong, but I don't think so. I think --

1      MS. DALTON:  Judge, and I just want to state for the
2  record --
3      THE COURT:  Yeah.
4      MS. DALTON:  -- that after speaking with his mother,
5  his mother also assured me, and I believe she also assured
6  pretrial services, that she would be the person to drive him to
7  Minnesota and make sure that he gets there.
8      THE COURT:  Let me -- since you raised the issue,
9  Ms. Dalton, there was a woman who testified before me on
10 Friday.  I am confident the defendant insisted that she take
11 him.  She was 89.  She was decimated.  She was a lovely woman.
12 And I tried -- I won't say -- it was shown beyond any doubt
13 that she absolutely knew nothing about what her son was doing,
14 even though the name was (unintelligible) papers.  She had no
15 inkling at all of what he was other than he was her son.  And I
16 stopped the government lawyer periodically from being --
17     MS. DALTON:  Rude?
18     THE COURT:  No, overly aggressive, shall we say.  And
19 I told him he didn't need to do it, it was obvious what was
20 happening.
21     In fact, I started to prepare an addendum to my
22 comments of last Friday really based on her -- on her.
23 Mothers do wonderful things for their children.  And I think
24 that his mom is here and said to you what you said, not
25 discounting what you say, is a testament more to her than it is

to anybody. And it doesn't make it true, it doesn't make it false. But she's the mom.

She ought to be able to stand up for her son. And what kind of a mother doesn't? I always thought that if a mom came in -- and in certain cases was willing to put up property, it -- it said a lot. And I told the government so, and they (unintelligible) when the government (unintelligible) apoplexy.

There were other indications -- there were other times when a mom came in and the dad and they wouldn't put up five cents. And they had a home to stay for their son or (unintelligible). I thought that spoke volumes about how reliable the word of the defendant was. Who knows better than they what the defendant was like.

So the fact that she is here and conveys to you that she thinks her son is grand is, I think, a testament to her. I don't think it is a basis for not sending him back to Minnesota or trying to send him back under his own steam. And if she says she will drive him, I don't have a doubt in the world that she would be Johnny-on-the-spot to drive him.

The question I have though is whether he will be there to go with her. And for reasons I have said, and I don't want to bore you with it, I don't think that -- the risk is too serious, and it cannot be overcome with any set of conditions that would assure he will go back to Minnesota. It is too much of a risk, so --

1    MS. DALTON: I just -- I guess, Judge, my only
2 argument in response to your decision is that there really just
3 hasn't been any indication, other than the fact that he's
4 charged with a serious crime, on why he would fail to appear.
5    THE COURT: Well, I don't think that's true at all. I
6 think the government in its way -- although (unintelligible)
7 the way you did absolutely showed that there is a serious risk
8 of his non-appearance in Minnesota. Is there a serious -- and
9 it doesn't appear that in the -- of course there is a serious
10 risk that there will be a continuity of the behavior. But I
11 can't be assured at all that in light of what I have heard that
12 he will actually show up. And the proof, the government has
13 the standard of proof, is very minimal here. I mean, it is
14 nothing. So I think they have proven there is a risk of
15 flight, whatever he argued.
16    The question is not what he says, the government says,
17 the question is what they have shown. And I was trying to --
18 they have shown, I think, when you take the totality of
19 everything, you sort of (unintelligible) together, and you look
20 at it carefully. I don't think that he is the right candidate
21 that I can accept his word that he will show up in Minnesota
22 because he says he will do so.
23    Now, as I have said over and over and over, it is a
24 prognostication. There is no way to know unless we do it. So
25 if I let him go and he doesn't show up, you and I will

1  commiserate with each other and then we will be
2  (unintelligible).  Your sense will be wrong, and my judgment
3  will be wrong.
4      I think it is simply not, in light of the elements, a
5  risk that I can (unintelligible).  So the order will be that he
6  will be in the custody of the marshals to Minnesota.
7      When he gets there, as I'm sure you have told him, he
8  is certainly free to make any application for bond that he
9  thinks appropriate and support it with whatever evidence he
10 supports it with.  Some judicial officer down there, a district
11 judge or a magistrate judge, will hear him -- the thing anew.
12     Does he have any -- the fact that he has nobody in
13 Minnesota, I would -- I assume is not going to be a total
14 deterrent to bond.  It isn't.  I mean, you know, there is lots
15 of people who are arrested in a district and get bond even
16 though they have no ties to the community.  Just one tiny
17 little factor.  There is a too much going the other way.  So
18 that will be the order.
19     And, again, I assume, Ms. Dalton, I'll see you
20 if -- if the marshals do that (unintelligible) promptly and get
21 him back, I'm confident you will be here with whatever motion
22 you want.  And I assume it will be another bond motion.
23     And -- but it -- but I think I have said to you, I
24 have not seen one incident ever in which the marshals did not
25 expeditiously (unintelligible) somebody was forced to come back

1  (unintelligible).  That doesn't mean it hasn't happened.  But I
2  don't think it will happen in this case.
3          All right.  Thank you very much.
4          MR. BOND:  Thank you, your Honor.
5       (Which concluded the proceedings.)
6                           CERTIFICATE
7          I certify that the foregoing is a correct transcript
8  from the digital recording of proceedings in the above-entitled
9  matter to the best of my ability, given the limitation of using
10 a digital-recording system.
11
12
13 */s/Pamela S. Warren*                    June 15, 2017
   Official Court Reporter                 Date
14 United States District Court
   Northern District of Illinois
15 Eastern Division
16
17
18
19
20
21
22
23
24
25